

# In the Court of Criminal Appeals of Texas

No. AP-77,095

BRANDON DE McCALL,
*Appellant*

v.

THE STATE OF TEXAS

On Direct Appeal from Cause No. 296-81183-2018
In the 296th District Court
Collin County

YEARY, J., delivered the opinion or a unanimous Court.

In February of 2020, a jury convicted Appellant of capital murder for fatally shooting a peace officer who was acting in the lawful discharge of an official duty. *See* TEX. PENAL CODE § 19.03(a)(1). Based

on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. *Id.* art. 37.071 § 2(h). Appellant raises nine points of error.[2] Having found no reversible error as to any of Appellant's points of error, we affirm the judgment of conviction and sentence of death.

## I. BACKGROUND

In February of 2018, Richardson Police Department officers responded to a "shots-fired" call at an apartment complex. When the officers arrived, they found Rene Gamez lying in a pool of blood outside his apartment. Gamez had a gunshot wound to his lower leg and was breathing shallowly. At that time, the officers did not know who or where the shooter was or whether there were any additional victims inside Gamez's apartment.

Believing others might be in jeopardy, the officers forced their way into the apartment. After kicking open the door, seven officers entered the apartment and announced themselves as police. The victim, officer David Sherrard, went in first.

As the group moved into the apartment, Appellant fired multiple rifle rounds from a back bedroom. Sherrard was struck twice. He announced that he was "hit" and exited the apartment.

---

[1] Unless otherwise indicated, all subsequent citations in this opinion to "Articles" refer to the Texas Code of Criminal Procedure.

[2] Points of error four and five reference arguments raised in other points of error and will be addressed together at the end of the opinion.

Once outside, Sherrard collapsed. He was attended to by paramedics on the scene and taken to a trauma unit, but he was later pronounced dead. Appellant was then tried and convicted of capital murder for Sherrard's death.

## II. CHALLENGES FOR CAUSE

In his first three points of error, Appellant argues that the trial court erroneously denied four of the defense's challenges for cause and erroneously granted one of the State's challenges for cause.

A venire person is challengeable for cause if he or she has a bias or prejudice against the law upon which either party is entitled to rely. *Buntion v. State*, 482 S.W.3d 58, 83−84 (Tex. Crim. App. 2016) (citing TEX. CODE CRIM. PROC. art. 35.16 §§ (a)(9), (c)(2)). The test is whether the bias or prejudice would substantially impair the venire person's ability to perform his duties in accordance with the court's instructions and the juror's oath. *Id.* at 84. Before a venire person can be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views. *Tracy v. State*, 597 S.W.3d 502, 512 (Tex. Crim. App. 2020). The party challenging a venire person bears the burden to establish that the challenge is proper, and he does not meet this burden until he has shown that the venire person understood the requirements of the law and could not overcome his prejudice well enough to follow the law. *Id.* But a venire person's bias need not be proven with "unmistakable clarity" because sometimes a venire person simply cannot be asked enough questions to reach a point where his bias has been made "unmistakably clear." *Buntion*, 482 S.W.3d at 84 (quoting *Wainwright v. Witt*, 469 U.S. 412,

424−25 (1985)).

When assessing a trial court's denial of a challenge for cause, we review the entire record to determine whether sufficient evidence exists to support the court's ruling. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). We reverse only for a clear abuse of discretion. *Id.* Because the trial judge is in the best position to evaluate a venire person's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference. *See Tracy*, 597 S.W.3d at 512.

### A. Appellant's Challenges for Cause

In point of error one, Appellant argues that the trial court erred in denying challenges for cause to four venire persons: Richard Davidson; Steven Brasher; Gregory Ashcraft; and David Rogers. He contends that the denials resulted in a jury that was biased or prejudiced and therefore deprived him of a fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

To establish reversible error for the erroneous denial of a challenge for cause, a defendant must show on the record that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire person; (3) his peremptory challenges were exhausted; (4) his request for additional peremptory strikes was denied; and (5) an objectionable juror sat on the jury. *Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014). By following these steps, "the defendant shows that he actually needed the peremptory strike that he was forced to use on a biased juror." *Id.* at

750.[3] In other words, a defendant is harmed if he is compelled to use one of his peremptory challenges to make up for the trial court's error in failing to grant his proper challenge for cause, since "a peremptory challenge was wrongfully taken from" him. *Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004) (citing *Martinez v. State*, 763 S.W.2d 413, 415 (Tex. Crim. App. 1988)).

When the record shows that the trial court granted the defendant's requests for additional peremptory strikes, the defendant must also show that at least one more challenge for cause was erroneously denied than the number of additional peremptory challenges he was allotted. *See Mason v. State*, 905 S.W.2d 570, 578 (Tex. Crim. App. 1995) ("[B]ecause appellant was granted three additional peremptory strikes, he did not suffer the loss of three strikes. Therefore, for appellant to demonstrate harm and, hence, reversible error, he must show that challenges for cause on *at least* four venirepersons were erroneously denied."). Only then has the appellant shown that he has been wrongfully deprived of a peremptory challenge. If a defendant fails to make this showing, he fails to show harm, and his complaint should be overruled for that reason. *See id.*

In this case, Appellant raised challenges for cause against Davidson, Brasher, Ashcraft, and Rogers. When those challenges were denied, Appellant exercised peremptory strikes against them.

---

[3] In a criminal trial, "[p]eremptory [challenges] are given to each side to use as they see fit." *Comeaux*, 445 S.W.3d at 749. Except for prohibited reasons such as race or sex, a "defendant may use those [peremptory challenges] to remove any member of the venire panel for any reason" or even for "no reason at all." *Id.*; TEX. CODE CRIM. PROC. art. 35.14 ("A peremptory challenge is made to a juror without assigning any reason therefor.").

Ultimately, the defense used all fifteen of its originally allotted peremptory strikes. Appellant then sought three additional strikes, two of which were granted and exercised against venire persons Jennifer Dominguez and David Hunter.

The trial court denied Appellant's request for an eighteenth peremptory challenge. As a result, Julie Meredith, a juror Appellant identified as unacceptable to him, was seated as his twelfth juror. But because the trial court had granted Appellant two additional peremptory challenges, he cannot show that he was harmed unless he can demonstrate that the trial court erred in denying at least three of his challenges for cause. *See Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004) (citing *Martinez v. State*, 763 S.W.2d 413, 415 (Tex. Crim. App. 1988)); *Mason*, 905 S.W.2d at 578.

### 1.    Davidson

Appellant first argues that Davidson was challengeable for cause because he "would have voted for the death penalty automatically." *See Ladd v. State*, 3 S.W.3d 547, 558–59 (Tex. Crim. App. 1999) (stating that a venire person is challengeable for cause where he would automatically answer the special issues in such a way that the death penalty would be assessed); *see also Banda v. State*, 890 S.W.2d 42, 57 (Tex. Crim. App. 1994). Appellant emphasizes an exchange in which defense counsel and Davidson discussed a hypothetical scenario involving a defendant found guilty of capital murder for killing a police officer with no applicable legal justification:

> Q: So once you find that scenario to be the facts of the case, that's why you -- that's what leads you to say that that's a person that deserves the death penalty. That type

of basic straightforward, intentional and knowing killing of a police officer, knowing that they are a police officer, no defenses, no self-defense, no defense of third person, no accident, no mistake, no mistake of fact, no duress, not insane at the time of the offense; none of that stuff. There is none of that stuff. Do you believe the death penalty is the appropriate punishment for that individual that's found guilty of that crime?

A: Yes, sir.

Q: Okay. And that answers Special Issue 1 for you?

A: Correct.

Q: And then when you get to Special Issue #2, the person[']s age, that's not going to be a mitigating factor under those circumstances for you, is it?

A: No.

Q: All right. Their upbringing, that's not really going to be a mitigating factor, is it?

A: No, sir.

Q: There -- there is really not much that cuts for you as far as something that might be considered mitigating, is there?

A: Probably not. Like I said, it would all depend on the circumstances of the event.

To the extent that this exchange suggested that Davidson would give an automatic response, the rest of his voir dire demonstrates otherwise. Throughout questioning by the State and the defense, Davidson repeatedly stated that he would need to know the facts of the particular

case before answering the special issues. When questioned by the State, Davidson agreed that he could keep an open mind in the punishment phase of trial and not answer either special issue automatically. He also agreed that he would need to hear "all the circumstances" in order to resolve the special issues and that he could look at all of the evidence with a fresh set of eyes in the punishment phase if he found somebody guilty of capital murder.

When questioning Davidson, defense counsel asked whether a person who commits capital murder would likely commit criminal acts of violence in the future. Davidson responded, "Probably. But like I said before, it would be what–what was the event; you know, what was the cause." Davidson later reiterated that his answers to the special issues "would depend on the circumstances of what was leading up to [the offense]." His responses as a whole reflect his understanding that the resolution of one special issue would not automatically resolve another. The record supports the trial court's determination that Davidson was not removable for cause because he would not automatically resolve the special issues. *See Ladd*, 3 S.W.3d at 558–59.

Appellant next contends that Davidson should have been removed for cause because he could not properly consider mitigation evidence. Under Article 37.071, if the jury returns an affirmative answer to the future-dangerousness special issue, then it must answer the following mitigation special issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, *the defendant's character and background*, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that

> a sentence of life imprisonment without parole rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(1) (emphasis added). Appellant asserts that Davidson could not consider the defendant's character and background in answering the mitigation special issue. *See Maldonado v. State*, 998 S.W.2d 239, 250 (Tex. Crim. App. 1999) ("[J]urors must be willing to at least *consider* the defendant's background and character . . . although they need not give *mitigating weight* to any particular type of evidence."). Appellant emphasizes the following exchange:

> Q: [T]he Defendant's background, upbringing, youth, level of intelligence, maybe, that kind of thing, that really doesn't come into play --
>
> A: No, sir.
>
> Q: -- as far as being mitigating for you?
>
> A: No, sir.

The record does not reflect that either party explained that the law would require Davidson to consider character and background evidence in analyzing the mitigation special issue. Therefore, Appellant has not shown that Davidson understood the law and could not overcome his prejudice well enough to follow it. *See Tracy*, 597 S.W.3d at 512. Moreover, while Davidson's responses indicated that he did not give much weight to certain types of mitigation evidence, the law does not require a juror to consider any particular piece of evidence to be mitigating. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012).

Additionally, the record reflects that Davidson did not dismiss all

character and background evidence out of hand. When questioned by the State, Davidson gave examples of evidence that he might consider mitigating. He further explained that he would be open to listening to the reasoning of other jurors with regard to the mitigation special issue. Overall, the record supports the trial court's determination that Davidson was not mitigation impaired.

Finally, Appellant contends that Davidson should have been removed for cause because he would not impartially assess witness credibility. A venire person is challengeable for cause under Article 35.16, Section (a)(9), if he cannot impartially judge the credibility of witnesses. *Feldman v. State*, 71 S.W.3d 738, 745 (Tex. Crim. App. 2002). However, a venire person is not challengeable for cause simply because he would slightly favor certain classes of witnesses, such as police officers and doctors, when deciding credibility, because "complete impartiality cannot be realized as long as human beings are called upon to be jurors." *Jones v. State*, 982 S.W.2d 386, 389 (Tex. Crim. App. 1998); *see also Ladd*, 3 S.W.3d at 560. Before a venire person can be excused for cause, the proponent of the challenge must show that the venire person expressed an extreme or absolute position on the credibility of witnesses and was not open-minded and persuadable. *Feldman*, 71 S.W.3d at 747; *Jones*, 982 S.W.2d at 389.

Davidson indicated on his juror questionnaire that he thought police officers were more likely to tell the truth than the average person. Under further examination, he agreed that, generally speaking, he would be inclined to give police officers credibility over other individuals. But he concluded that, while he would give police officers the benefit of

the doubt, "if what they are saying doesn't match up to what looks like really happened, then I think I would be able to determine that." As a whole, Davidson's testimony reflected that he was persuadable, was open to questioning police testimony, and did not hold an absolute view on police officers' credibility. *See Feldman*, 71 S.W.3d at 747.

Looking at the totality of Davidson's questioning, we conclude that the trial court did not abuse its discretion by overruling Appellant's challenge for cause to Davidson.

## 2.     Brasher

Appellant contends that the trial court erred in denying his challenge to venire person Brasher because Brasher's testimony reflected that he would lower the State's burden of proof on the future-dangerousness special issue. To answer the future-dangerousness special issue "yes," the jury must find beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1). Appellant argues that the term "probability" is not statutorily defined but is to be taken and understood under its common meaning. *See Hughes v. State*, 878 S.W.2d 142, 147–48 (Tex. Crim. App. 1992) (op. on orig. sub.). He asserts that this Court has recognized that the common meaning of the term requires something "more than a mere possibility" or something "more than a bare chance." *Id.* at 148. Appellant complains that Brasher consistently stated that probability—in the context of the future-dangerousness special issue—meant only a bare chance that something would happen. He points to the following exchange with defense counsel:

Q: [W]hat do you think we mean by probability?

A: Probability is a chance that it could happen.

Q: Is probability a chance?

A: That's -- yes, probability is a chance that it could happen.

Q: Do you understand that the legislature, when they wrote [the future-dangerousness special issue], they could have used any word they wanted there. They could have put possibility, they could have put maybe, they could have put a chance, but they used the term "probability." Would you agree with me that probability means more likely than not?

A: Might. But I'll stick to what I said, that probability is a chance.

Q: Do you think that a probability -- after looking at it, do you think that probability would exist, that there is ever a chance that something could happen, then that's a probability to you?

A: I am still going to say probability means there is a chance.

Q: Would you agree that there is a chance that any of us could be a future danger?

A: Yes.

Q: So if your definition of probability is chance, wouldn't that lead you to find that anybody that is convicted of capital murder would be likely to commit future acts of violence?

A: I am just going to stick with what my --

probability is a chance.

Appellant concludes that Brasher's definition would lower the State's burden of proof on the future-dangerousness special issue.

However, defense counsel did not instruct Brasher that the law required him to accept that "probability," for the purposes of the future-dangerousness special issue, meant something more than a bare chance. Counsel merely asked Brasher his personal definition of "probability," and Brasher answered without the benefit of a legal explanation. Because Brasher was not instructed on the law, Appellant has not shown that the trial court abused its discretion by denying Appellant's challenge for cause to Brasher on this basis. *See Tracy*, 597 S.W.3d at 512.

Appellant also asserts that Brasher should have been removed for cause because he could not consider mitigation evidence as required by the mitigation special issue. In his juror questionnaire, Brasher indicated that characteristics like genetics, circumstances of birth, upbringing, and environment should not be a consideration in determining punishment. He identified these traits as "excuses for why me." When the prosecutor questioned Brasher about his response, he elaborated: "Why is someone blaming every other thing for their situation and not taking ownership of the consequences." Appellant contends that this exchange showed that Brasher was incapable of considering any mitigation evidence and should have been disqualified. *See Morgan v. Illinois,* 504 U.S. 719, 739 (1992) (holding that jurors who consider mitigating factors irrelevant should be disqualified for cause).

Appellant relies on an exchange that occurred before the law was

explained to Brasher. The State subsequently explained that jurors were required to consider mitigation evidence and again asked him if he would be able to consider such evidence:

> Q: [I]f you have already found somebody guilty, [and] you have already found that they are a future threat, can you still give consideration to whatever it is you hear with the possibility that it may make a difference?
>
> A: I would still, based on the facts that were given and based on what the law is that I am supposed to follow, that would be my decision.

Brasher repeated this sentiment in a later exchange with defense counsel:

> Q: Do you think that there [are] things that you can consider, like birth, upbringing and environment, things like that, that you might consider if you were on a case like this?
>
> A: I have never thought about that until I've been presented with that question right now. Is it something that I could consider? Yes, I can consider it.

These exchanges demonstrate that, once the law was explained to him, Brasher communicated that he could follow the law. As the proponent of the challenge for cause, Appellant had the burden to show that Brasher understood what the law required from him, but that he would be unable to follow the law. *Tracy*, 597 S.W.3d at 512. The trial court did not abuse its discretion to find that Appellant did not meet his burden. Therefore, he has not shown that the trial court abused its discretion by overruling the challenge for cause to Brasher.

### 3. No Harm Shown

As discussed above, because Appellant received two additional peremptory strikes, he cannot demonstrate harm unless he shows that the trial court erroneously denied at least three of his challenges for cause. *Newbury*, 135 S.W.3d at 31. Appellant complains about the denial of four challenges for cause. We have concluded that the trial court did not err in the preceding two challenge-for-cause rulings. Accordingly, even if we assume that the trial court erred in denying Appellant's challenges for cause to the two remaining venire persons at issue, Appellant cannot show harm. *See id.* We overrule point of error one.

### B.  State's Challenge for Cause

In his next two points of error, Appellant contends that the trial court erroneously granted the State's challenge for cause to venire person Debra Solomon.[4]

Under Article 35.16, Section (a)(9), the State may challenge a venire person for cause if the person is biased or prejudiced in favor of or against the defendant or against any of the applicable laws on which the parties are entitled to rely. The test is whether the bias or prejudice would substantially impair the venire person's ability to carry out his oath and follow instructions in accordance with the law. *Tracy*, 597 S.W.3d at 512. Before a venire person can be excused for cause, the law must be explained to him, and he must be asked whether he can follow that law regardless of his personal views. *Id.*

In her juror questionnaire, Solomon indicated that she would need "one-hundred percent proof" in order to resolve the special issues

---

[4] Appellant refers to the challenged venire person as "Soloman." However, the record uses the spelling "Solomon," and this is how we will refer to her in this opinion.

in such a way that resulted in the application of the death penalty. At voir dire, both the prosecutor and defense counsel explained that the law only required that the State prove its case beyond a reasonable doubt. Once both parties explained the law, the trial court attempted to gauge Solomon's understanding of the burden of proof:

> COURT: When the State is asking you whether or not you are going to require a hundred percent, the real question is do you understand what the definition of reasonable doubt is to you.
>
> [SOLOMON]: Well, I could give you a lot of different scenarios and I'm sure you could to me. But to me, I mean, the facts would just have to be without -- undisputable. I mean, presented to you as though they are just -- there is not a if[,] and, or a but. No question, no gray area. It would have to definitely be something that they had proven that -- I mean, you are not going to sentence anybody to death because . . . there is some lack of guilt there that isn't covered.

The State challenged Solomon for cause on the basis that—by requiring "undisputable," one-hundred percent certainty—she would hold the State to a higher burden of proof than required by law. The trial court ruled as follows:

> [T]he Court finds that the prospective juror would hold the State to a higher burden; and, two, the Court is going to find on its own this is a vacillating juror. She is all over the place. She seems to be wanting to please the attorneys and trying to figure out what you are really asking [her] . . . and not actually the question before [her]. So for those reasons, the Court grants the challenge for cause by the State.

In point of error three, Appellant argues that the trial court erred

in removing Solomon as a vacillating juror.[5] When a venire person's answers are vacillating, equivocating, ambiguous, unclear, or contradictory, we afford particular deference to the trial court's decision. *Tracy*, 597 S.W.3d at 512. In an exchange with defense counsel, Solomon agreed that she could follow the law and hold the State to the reasonable doubt burden of proof. However, when the trial court attempted to clarify Solomon's understanding of the standard, she appeared to waver:

> [COURT]: All right. What we are having trouble with is we are not sure where you are in regards to reasonable doubt when you say a hundred percent or beyond a shadow of a doubt. We don't know if that's the same thing or those are different things for you, so tell us, if you can. Are those different things?
>
> [SOLOMON]: I never really gave that any thought before. So in the last 15 seconds here, to decide what the difference is between a reasonable or a shadow of a doubt, I would think that in the circumstances of guilty or not guilty, that it would just be that it would either be -- to me, it would have to be a hundred percent; or if it was 95 and I -- that's what you are saying, the difference between a hundred reasonable and -- if that's it, or 95 being shadow of a doubt, if that's what you are -- something along that gray area there? * * * I think that once -- if it is proven beyond a reasonable doubt, to me a reasonable doubt would be -- I mean, I guess if he is proving beyond a reasonable doubt, then I would expect

---

[5] Appellant asserts that the trial court erred in *sua sponte* raising vacillation as a basis for removal. However, Appellant does not provide argument in support of this assertion, so we will not address it. *See* TEX. R. APP. P. 38.1(i).

> that you would have that reasonable doubt there or some evidence to counteract what he has proven, and I feel that the person is guilty, then can you prove that they are not after he has proved that they are? I don't know. I am not sure what reasonable doubt here is coming down to.

When asked directly whether she would hold the State to a one-hundred percent standard, Solomon responded, "I would need some very good evidence, yes." Then she concluded, "I think I would be tempted on the hundred percent point."

Here, the record indicates that Solomon ostensibly committed to follow the reasonable doubt burden of proof. However, Solomon consistently asserted that she intended to hold the State to a burden of one-hundred percent certainty, indicating that she either misunderstood the reasonable doubt standard or vacillated in her commitment to follow it. Under these circumstances, the trial court would not have abused its discretion by excusing Solomon on this ground. Because the record supports the trial court's removal of Solomon on this basis, we cannot find that it erred in sustaining the State's challenge for cause to Solomon. We overrule point of error three.

In point of error two, Appellant asserts that the trial court erred in granting the State's challenge for cause because the law was not properly explained to Solomon. He complains that the State's explanation of the burden of proof failed to distinguish "reasonable doubt" from "possible doubt." He further complains that the State described the different standards of proof in terms of percentages (i.e., the reasonable doubt standard was described as "more than fifty percent certainty" and the "beyond all possible doubt" standard was equated

with "one hundred percent certainty"). Appellant argues that this language confused Solomon and diluted the State's burden of proof.

Solomon herself introduced the percentage language when she indicated on her juror questionnaire that she would need "one-hundred percent proof" to impose the death penalty. The record reflects that both parties and the trial court adopted percentage analogies to clarify her response and to determine whether Solomon could apply the correct burden of proof.

Further, the law on the reasonable doubt standard of proof was properly explained to Solomon. Before the trial court questioned Solomon, the defense explained that "[t]he State doesn't have a burden to prove anything beyond a shadow of a doubt or all possible doubt. It is just beyond a reasonable doubt in a juror's mind, and there is no definition of reasonable doubt anymore in the State of Texas." Because the law was properly explained to Solomon, the State only needed to show that she could not follow the law to establish that the challenge for cause was proper. *See Tracy*, 597 S.W.3d at 512. As shown above, Solomon either misunderstood the reasonable doubt standard or vacillated in her ability to follow it. Therefore, the trial court did not err in concluding that Solomon could not follow the law. We overrule point of error two.

### III. CONSTITUTIONAL CHALLENGES

In points of error six, seven, and nine, Appellant complains that the Texas statutory death penalty scheme is unconstitutional both facially and as applied.

### A.    Facial Challenge–Mitigating Evidence

In point of error six, Appellant asserts that the trial court erred in failing to declare the Texas death penalty statute facially unconstitutional for limiting the definition of "mitigating evidence" to that which reduces a defendant's "moral blameworthiness." *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(f)(4). In a facial challenge like this one, a claimant asserts that the complained-of law operates unconstitutionally in all of its potential applications. *See Estes v. State*, 546 S.W.3d 691, 697–98 (Tex. Crim. App. 2018). Appellant raised this facial constitutional challenge in a pretrial motion, which the trial court denied.

With regard to the mitigation special issue, the trial court is required to instruct the jury that mitigating evidence is "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PROC. art. 37.071 § 2(f)(4). Appellant contends that requiring mitigation evidence to reduce "moral blameworthiness" creates a nexus between mitigating evidence and the present offense because a typical jury would infer that "blameworthiness" relates to culpability for the crime at hand. This nexus, Appellant asserts, improperly limits the scope of mitigating evidence and renders the statute unconstitutional under the Eighth Amendment and *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (rejecting the notion that proffered mitigation evidence must establish a nexus to the crime in order to be relevant).

We have previously considered and rejected this same or similar claims. *See Hall v. State*, 663 S.W.3d 15, 43 (Tex. Crim. App. 2021), *cert. denied*, 143 S. Ct. 581 (2023); *Coble v. State*, 330 S.W.3d 253, 296 (Tex.

Crim. App. 2010). Appellant's argument does not persuade us to revisit these holdings. We overrule point of error six.

### B.      As Applied Challenge–Mitigating Evidence

In his seventh point of error, Appellant contends that Article 37.071, Section 2(f)(4), is also unconstitutional as applied.[6] In an as-applied challenge, the claimant concedes the general constitutionality of the statute but asserts that the statute is unconstitutional as applied to his particular facts and circumstances. *Estes*, 546 S.W.3d at 698. In reviewing the challenge, the Court begins with the presumption that the Legislature acted both rationally and validly in enacting the law under review. *Id.* In light of this presumption, the challenger bears the burden of producing evidence specifically demonstrating that the law in question is unconstitutional as applied to him. *Id.* That the law may be unconstitutional as to a hypothetical third party is not sufficient or relevant to the inquiry. *See id.* (citing *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011)).

Appellant contends that the voir dire testimony of venire persons Gretchen Grese and Ryan Johnson showed that each inferred that Article 37.071, Section 2(f)(4), required a nexus between mitigating evidence and the present offense. He further argues that this inferred nexus requirement would have caused the venire persons to ignore the following character and background evidence: (1) testimony from

---

[6] This provision reads: "The court shall charge the jury that in answering [the mitigation special issue] submitted under Subsection (e) of this article, the jury . . . shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PROC. art. 37.071 § 2(f)(4).

Appellant's former employers that they considered him non-violent, polite, a hard-worker, and a nice person; (2) testimony from Appellant's friends that they had never known him to be violent or aggressive; and (3) testimony from Appellant's brother describing the siblings' difficult childhood.[7]

There are two fundamental problems with Appellant's as applied challenge. First, Appellant relies on voir dire testimony that encompassed only hypothetical applications of Article 37.071. At best, this testimony showed how the individual venire persons would approach mitigating evidence. It does not show that the statute itself operated unconstitutionally as applied to Appellant's facts and circumstances. Second, at its core, the claim presents an attack on the plain language of Article 37.071, Section 2(f)(4). By arguing that venire persons Grese and Johnson would have applied a nexus requirement he believes is inherent in Article 37.071, Section 2(f)(4), Appellant is essentially just reasserting his facial constitutionality arguments that the plain language of the statute creates a nexus requirement in violation of the Eighth Amendment and *Tennard*. As discussed in the analysis for point of error six, we have previously considered and rejected the same or similar claims.

Appellant fails to show that the statute is unconstitutional as applied to his particular facts and circumstances. We overrule point of error seven.

---

[7] The defense used a peremptory strike against venire person Grese, and she was not seated on the jury. Therefore, her interpretation of Article 37.071 could not have affected the outcome of the case and any injury to Appellant was purely hypothetical. *See Lykos*, 330 S.W.3d at 910.

### C.     Facial Challenge–Definitions of Terms

In point of error nine, Appellant complains that Article 37.071, Section 2, is unconstitutional because it does not define the following terms: "personal moral culpability," "moral blameworthiness," "probability," "criminal acts of violence," "continuing threat to society," and "society." Appellant raised these complaints in pretrial motions. The trial court heard and overruled Appellant's motions at a pretrial hearing.

This Court has reviewed and rejected the same or similar claims on several occasions. *See, e.g.*, *Jenkins v. State*, 493 S.W.3d 583, 615 (Tex. Crim. App. 2016) (rejecting the need to define "probability," "criminal acts of violence," and "continuing threat to society"); *Coble*, 330 S.W.3d at 297 (rejecting the need to define "probability," "criminal acts of violence," and "society"); *Davis v. State*, 313 S.W.3d 317, 354–55 (Tex. Crim. App. 2010) (rejecting the need to define "personal moral culpability," "moral blameworthiness," and other terms). We decline to revisit this issue, and we overrule point of error nine.

### IV. VOIR DIRE LIMITATIONS

In point of error eight, Appellant complains that the trial court improperly limited the defense's voir dire questioning of venire persons, as exemplified by the individual voir dire of venire persons Grese and Johnson. Specifically, Appellant claims that the trial court "refused to allow defense counsel to question prospective jurors [on] whether they would consider defensive evidence offered in mitigation if that evidence did not reduce the defendant's 'moral blameworthiness' for the commission of the offense." (App. Br.: 70). Stating his claim another way,

Appellant argues that the trial court's rulings "prohibited the defense from conducting voir dire questioning to determine whether the jurors could consider mitigating evidence proffered by the defense that did not reduce the defendant's 'moral blameworthiness' for the commission of the offense." (App. Br.: 74). He contends that the trial court's actions violated his right to conduct "meaningful voir dire" as required by "the Supreme Court's rule in *Morgan v. Illinois*, 504 U.S. 719 (1992), and the Sixth, Eighth, and Fourteenth Amendments." (App. Br.: 69).

At the outset, it should be noted that Appellant's point of error number eight is multifarious in that it attempts to invoke violations of a rule announced in a United States Supreme Court opinion, the Sixth Amendment, the Eighth Amendment and the Fourteenth Amendment to the United States Constitution without providing separate and distinct arguments for why each of those provisions has been violated. Moreover, Appellant wholly fails to point to any specific question in the record that was not permitted to be asked. Instead, he points this Court to nine pages of the record comprising a litany of questions propounded and dialogue between the parties and the trial court during voir dire. (App. Br.: 70) (citing 20 RR 189−90, 194, 196; 21 RR 74−77; and 21 RR 80).

A trial court has discretion to restrict voir dire questions that are confusing, misleading, vague, broad, or that are improper commitment questions. *See Hernandez*, 390 S.W.3d at 315. We therefore review a trial court's ruling limiting voir dire questioning for an abuse of discretion, focusing on whether the appellant proffered a proper question regarding a proper area of inquiry. *Id.*

## A.     The Proffered Question(s)

Individual voir dire commenced on September 30, 2019, and it lasted until November 19, 2019. Grese was, by our count, the 58th venire person examined, on October 21st. Johnson was the 60th venire person examined, the next day. At the end of Johnson's individual voir dire, Appellant was granted a running objection to the trial court's failure to permit him, over the State's objections, to pose a certain question to the remaining venire persons. A total of 125 venire persons were examined. Thus, Appellant complains in essence that he was deprived of asking his proffered question to a little more than half of the venire persons.

The question Appellant wished to propound to those venire persons pertained to their understanding of the scope of Article 37.071, Section 2(f)(4)'s definition of "mitigating evidence." That provision requires the jury, in applying the second "mitigation" special issue embodied in Article 37.071, Section 2(e)(1), to "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."[8] Fearful that prospective jurors might construe this statutory language in a manner that is unconstitutionally narrow, Appellant sought to ask the venire persons a hypothetical question. He proposed to ask whether, if they perceived there to be some aspect in the punishment phase evidence that justified

---

[8] Article 37.071, Section 2(e)(1) requires the trial court to instruct that jury to answer "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."

a sentence of less than death, but they construed Section 2(f)(4)'s definition as too constricting to accommodate that evidence, they could still answer the special issue "yes" despite their narrow understanding of the statutory definition. The State objected that this constituted an impermissible "commitment" question, and the trial court by and large prohibited Appellant from obtaining an answer from either Grese or Johnson.

A commitment question is one that commits a venire person to resolve, or refrain from resolving, an issue a certain way after learning a particular fact. *Hernandez*, 390 S.W.3d at 315. Often a commitment question requires a "yes" or "no" answer, and the answer commits a juror to resolve an issue in a particular way. *Id.* By asking, "are you going to go ahead and answer yes or are you going to answer that question no," Appellant's hypothetical posed a "yes" or "no" inquiry that sought to commit Grese and Johnson to a particular legal resolution of the mitigation special issue. Whether that commitment question was a "proper" one depends upon whether the venire person's commitment to answer the question in a particular way would constitute a basis for a challenge for cause. *See Standefer v. State*, 59 S.W.3d 177, 182 (Tex. Crim. App. 2001) ("[F]or a commitment question to be proper, one of the possible answers to that question must give rise to a challenge for cause.").

We need not decide whether a proper commitment question could be fashioned to address Appellant's concern about Section 2(f)(4)'s definition of "mitigating evidence." In our view, the specific questions Appellant sought to ask were improper, in any event, as too confusing

and misleading. They were premised on the improper assumption that Section 2(f)(4)'s definition is, in fact, unconstitutionally narrow, contrary to this Court's construction. *See Coble*, 330 S.W.3d at 296 (holding that it is "not the case" that a jury would be "reasonably likely" to construe the statutory language in an unconstitutionally narrow fashion). In short, they misrepresented the state of the law.

## B. Grese

Defense counsel began his discussion of mitigating evidence with venire person Grese by suggesting what may well have been an improperly *broad* definition of mitigation. He told her that "[e]veryone" (presumably he meant jurors) "is allowed to be as merciful as they want to be, period." Of course, the United States Supreme Court has made it clear that a juror's exercise of *mere* "mercy"—that is, mercy that it is untethered to any proffered evidentiary basis for mitigation—would be inappropriate. *See California v. Brown*, 479 U.S. 538, 542 (1987) (approving of a jury instruction in a capital case informing the jury to avoid "mere sympathy" in assessing whether to impose the death penalty because it instructs them to avoid considerations apart from the evidence actually presented at the punishment phase).

Defense counsel next told Grese that he had what he himself characterized as "a weird question" for her. The following colloquy ensued:

> [DEFENSE COUNSEL]: Now, you understand you are going to get an instruction -- if you are on the jury in this case, you are going to get an instruction, when it comes to Special Issue #2, that mitigation is anything that would affect the moral blameworthiness of an individual.

[GRESE]: Okay.

[DEFENSE COUNSEL]: That's kind of a broad question, but what it comes down to is this. If there is a reason that you do not want to impose the death penalty, any reason at all, you have the right to do that. Do you understand?

[GRESE]: Yeah.

Again, defense counsel misinformed the venire person. A juror in a capital prosecution may not properly, for example, refuse to impose the death penalty simply to vindicate her conscientious scruples against the death penalty in general. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (a prospective juror is challengeable for cause when his views about the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath").

Defense counsel continued:

[DEFENSE COUNSEL]: Now, if the Court gives you an instruction that it comes down to the individual's moral blameworthiness, is that going to be something that throws you off or causes an issue, or is it going to be something that you are going to feel like you have to follow or --

[STATE]: I am going to --

[GRESE]: I feel I would have to --

THE COURT: Stop, stop.

[STATE]: I am going to object at this point in asking a juror with regard to disregarding the law. The law will be defined by the Court.

THE COURT: I don't like the question, so sustained.

[DEFENSE COUNSEL]: Let me say it like this. The law requires that whatever mitigating factors you choose must reduce moral blameworthiness, okay?

[GRESE]: Okay.

[DEFENSE COUNSEL]: If a situation like that comes up, is that something that you can apply anyway, or are you going to let someone tell you that your reasoning may not meet the definition of moral blameworthiness?

[STATE]: I am going to object for a commitment question and I am also going to object with regards to asking the juror outside what the law is that is given by the Court.

THE COURT: Sustained.

[DEFENSE COUNSEL]: I am going to try this one more way, and if I get shut down, I am going to stop, okay?

[GRESE]: Okay.

[DEFENSE COUNSEL]: Hypothetically, in a situation where you have found someone guilty, you have gone through Special Issue #2 and -- Special Issue #1 and you are looking at [S]pecial Issue #2, okay? And in your mind, you have got a reason in your mind that Special Issue #2 should be answered yes, that that person's life should be spared, okay?

[GRESE]: Okay.

[DEFENSE COUNSEL]: But the reasoning you have in your mind does not affect the definition or does not affect the moral blameworthiness, are you going to go ahead and answer yes or are you going to answer that

question no?

[STATE]: Objection, commitment, and it does not - -

THE COURT: Sustained.

[DEFENSE COUNSEL]: Will you follow the law I've been talking about the last couple of minutes, even though, in your mind, the answer may be yes?

[STATE]: Again, the same commitment question.

THE COURT: Just ask if she is going to follow the law?

[DEFENSE COUNSEL]: Well, are you going to follow the law regardless of what your personal opinion is?

[GRESE]: Yes.

THE COURT: There you go. There you go.

Later, in explaining to the trial court the basis for his challenge for cause against Grese, which was denied, defense counsel argued:

[DEFENSE COUNSEL]: Your Honor, we would challenge the juror for cause for the following reason: The State's use and reliance upon the statutory definition of mitigation as something that reduces a person's moral blameworthiness for the commission of the offense restricts the proper consideration of mitigation and causes the juror to be mitigation impaired.

THE COURT: Didn't y'all use the same definition? Y'all used -- in your question, you used exactly the same definition.

***

[DEFENSE COUNSEL]: . . . Now, yes, we are both

using the same definition because it is the statutory definition --

THE COURT: Right.

[DEFENSE COUNSEL]: -- that the Court will give. In prior challenges to the constitutionality of that particular definition, the Court of Criminal Appeals has consistently said, when they deny the allegation of unconstitutionality, that jurors somehow discern that they are not limited to that definition. They've never explained how the jurors know that, but that's what they've said in their opinion.

So, basically, all we are trying to do is show them what the Court of Criminal Appeals says they already know, and this is that mitigation is not really limited to that definition. So when they are limiting it to the definition and we are not being allowed to tell the jury that they can, in fact, act upon their own personal moral judgments, regardless of the definition, then we are restricting it beyond the place where the Court of Criminal Appeals indicates they already are.

***

And our question that we pose is if you think based on what you've heard in the trial that you would answer yes to Special [Issue] 2, but because of the Court's definition, they are going to answer no, because in your mind it doesn't reduce the moral -- personal moral blameworthiness, and you are going to do that. So even though you think the answer ought to be yes, and I think I should spare this person's life based on what I heard, I don't think that meets the Court's definition of reduction of moral blameworthiness; so, therefore, I am going to say no, even though I would otherwise answer it yes. That's where we're going.

THE COURT: Okay. I understand.

[DEFENSE COUNSEL]: I want to make sure it is clear in the record that's what we are trying to -- the response we are trying to elicit so that the record is clear.

THE COURT: You probably need to be a little more articulate with your question.

[DEFENSE COUNSEL]: I'm sure I probably could.

Appellant then exercised a peremptory challenge against Grese, and she was excused.

### C.     Johnson

Defense counsel attempted to question venire person Johnson along similar lines:

[DEFENSE COUNSEL]: So let's say that you think the answer to Special [Issue] 2 should be yes, but when you think about it intellectually, you can't square what you think with the definition of it reduces the moral -- or the personal moral blameworthiness of a defendant. In other words, it is something that tells you the answer should be yes, but when you think about what those words means to you, personal -- reducing personal moral blameworthiness, that doesn't fit, so how you are stuck between, well, I think the answer ought to be yes, but this definition the Court gave me of what mitigation is, which is reducing this personal moral blameworthiness, that's what I have got to follow. That what the law would say, okay?

So first off, can you take the oath to follow the law?

[JOHNSON]: Yes.

[DEFENSE COUNSEL]: And even though you thought the answer would be yes, would you answer no if you weren't convinced that whatever you thought was telling you to be yes didn't reduce the personal moral blameworthiness of the Defendant?

The State raised a commitment objection, and the trial court sustained the objection. Defense counsel rephrased the question as follows:

> [DEFENSE COUNSEL]: All right. Mr. Johnson, you may answer yes to the Special Issue #2 based on any evidence you have heard that could serve as a basis for you to think that a sentence of life without parole is more appropriate than death, regardless of any instruction given by the Court as to what the definition of mitigation would be.

The State objected that the question called for the juror to disregard the law. The trial court sustained the objection, and the defense counsel rephrased the question again:

> [DEFENSE COUNSEL]: [H]aving found somebody guilty of capital murder of a police officer and having found beyond a reasonable doubt that Special Issue #1 is yes, would you be able to answer Special Issue #2 yes so as to impose a sentence of life without parole on an individual if you thought that was the right thing to do?
>
> [JOHNSON]: Yes. And in terms of that, the right thing to do would be based off of the circumstances that I am considering.
>
> [DEFENSE COUNSEL]: Okay. But you would be, in your mind, bound by any definition given to you by the Court as to what the definition of mitigating would be?
>
> [JOHNSON]: I would follow the indications of the Court.
>
> [DEFENSE COUNSEL]: Okay. So once again, if it you thought that the answer would be yes but it didn't meet your understanding of reducing the personal moral blameworthiness of the Defendant, you would answer -- you would follow the Court's instruction and answer no?

[STATE]: Objection, commitment.

THE COURT: Say that again, [counsel]. I lost you on that one.

The defense counsel again restated the question, and the State reasserted its commitment objection. In response, the trial court interjected:

THE COURT: All he is asking on that question is can he follow the Court's instruction.

[DEFENSE COUNSEL]: That's what I am asking.

THE COURT: That's how I took that question, so you can answer that question.

[JOHNSON]: Yes.

Defense counsel challenged Johnson for cause based upon his ultimate answer, explaining as follows:

[DEFENSE COUNSEL]: [B]ecause of the instruction the Court will give as to mitigation, reducing -- being defined as reducing the personal moral blameworthiness of the Defendant, that that instruction flies in the face of Tennard v. Dretke, and that that - - because the juror would follow the Court's instruction as the law, even though he might think there is something that should serve as a reason for him to answer yes to Special Issue #2 and sentence a defendant to life without parole, he would answer that question no solely based on the instruction of the Court of the definition of mitigation, so we would object that the individual under the Supreme Court of the United States is mitigationally impaired[.]

The trial court overruled Appellant's challenge for cause, and then

granted him a running objection. It is not altogether clear, however, whether the running objection was necessarily to the persistent failure of the trial court to permit the question, or instead to any continued failure to grant challenges for cause based upon the ultimate answers Appellant was able to obtain, once he phrased the question to the trial court's satisfaction.[9] Appellant did not exercise a peremptory challenge against Johnson, who ultimately served on the jury.

## D.      The Propriety of the Question

Appellant claims that he was impermissibly constrained in his ability to test the qualifications of the venire persons to impose a life sentence rather than the death penalty, under *Morgan v. Illinois. See* 504 U.S. 719, 736 (1992) ("Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty."). But the trial court did not completely foreclose specific voir dire about the venire persons' ability to consider evidence in mitigation of the death penalty, as in *Morgan. See*

---

[9] Immediately after the trial court denied the challenge for cause against Johnson, the following exchange occurred:

> [DEFENSE COUNSEL]: Your Honor, may we have a running objection, to kind of save time, just call it the Tennard objection, where it is appropriate for -- in future instances?

> THE COURT: If you think that's appropriate, I will allow you to have a running objection.

Appellant argues that he was thus "granted a 'running objection' to the [trial] court's action." (App. Br.: 70). Whether that objection was to anticipated denials of future challenges for cause or to the anticipated further denial of Appellant's proffered line of questioning is debatable.

*id.* at 723–24 (describing the trial court's failure to permit *any* question tailored specifically "to question potential jurors so as to identify and exclude any who would vote for the death penalty in every case after conviction for a capital offense"). It simply disallowed the form of the specific question by which Appellant attempted to test the prospective jurors' qualifications in that regard. *See Hernandez*, 390 S.W.3d at 315 ("Where the trial court does not place an absolute limitation on the substance of an appellant's voir dire question, but merely limits a question due to its form, the appellant must attempt to rephrase the question or risk waiver of the alleged voir dire restriction."). And rightly so.

The flaw in Appellant's proffered question is that it assumed a state of the law that is not accurate. It presumed that the statutory language in Article 37.071, Section 2(f)(4), is unconstitutionally narrow on its face, such that a juror who felt bound by a trial court's instruction limited to the statutory language would be constrained in his ability to give effect to the full panoply of mitigating evidence. But this Court has declared the contrary—at least to the extent that we have held that the statutory language does not suggest a "nexus" requirement between the offense and the mitigating evidence. *Coble*, 330 S.W.3d at 296. In fact, the Court has observed that it is not "reasonably likely" that a jury would "infer" such a nexus requirement from an instruction based upon the statutory text. *Id*. Nor has the Court ever declared the statutory language to be constitutionally deficient in any *other* regard that would unconstitutionally circumscribe a juror's ability to give full effect to a defendant's proffered evidence in mitigation of the death sentence. It

was therefore improper to predicate a voir dire question upon an inaccurate understanding of the state of the law.

Ultimately, the problem is not with *what* Appellant was trying to accomplish by his question so much as with *how* he was going about it. It *might* have been possible for him to formulate a proper commitment question—one that could, depending upon the answer, have given rise to a challenge for cause. But we need not decide that question today. We hold only that the trial court did not abuse its discretion by declining to permit Appellant to approach this topic in the way that he did, which was inherently confusing and misleading because it assumed that the statutory law, to which the jurors would be bound, was somehow *not* the law. To the extent that the trial court's grant of a running objection amounted to a ruling that Appellant would not be permitted to ask similarly improper questions to the latter half of the venire persons on the panel (if that is what it did), the trial court did not err.

## V. LAWFULLY CONSTITUTED JURY

In points of error four and five, Appellant contends that errors in the trial court's rulings on challenges for cause to venire persons Davidson, Brasher, Ashcraft, Rogers, Johnson, and Solomon, either by themselves or in any combination, deprived him of a lawfully constituted jury, which he claims somehow violated his rights under the federal (Sixth Amendment and due process) and state (Article 1, Section 10) constitutions and Article 35.16.[10] We disagree.

We have already concluded that the trial court's denial of

---

[10] U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 35.16.

Appellant's challenges for cause against Davidson and Brasher was within its discretion. Appellant excused them both by peremptory challenge, as he likewise excused Ashcraft and Rogers, so none of them served on the jury. We have also concluded that the trial court acted within its discretion by granting the State's challenge for cause against Solomon.

The only venire person about whom Appellant complains in these points of error who ultimately served on the jury was Johnson. But Appellant brings no independent point of error in this appeal challenging the trial court's denial of his challenge for cause against Johnson. And he makes a wholly inadequate argument, within the confines of these brief and multifarious points of error, to demonstrate how the trial court abused its discretion by denying that challenge for cause.

There is no right to have any particular person serve on a jury. *Colone v. State*, 573 S.W.3d 249, 261 (Tex. Crim. App. 2019). Appellant has not shown that any of the venire persons who ultimately *did* serve on his jury somehow deprived him of a lawfully constituted jury—that is to say, a jury made up of jurors who were qualified. *Id.* Because he does not *otherwise* demonstrate how the composition of the jury that ultimately sat violated any of the various federal and constitutional provisions he cites, he is not entitled to relief on these claims. We overrule points of error four and five.

### VI. CONCLUSION

We affirm the trial court's judgment of conviction and sentence of death.

**DELIVERED:**                                      October 25, 2023
**DO NOT PUBLISH**